1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION

4                   - - -

5   UNITED STATES OF AMERICA,    :  CRIMINAL NO. 1:13-CR-53
                                 :
6            Plaintiff,          :  Hearing on Revocation of
        -vs-                     :  Supervised Release
7                                :
    MICHAEL BARTLETT,            :  Monday, December 11, 2017
8                                :  11:10 a.m.
             Defendant.          :  Cincinnati, Ohio
9                   - - -
10               TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE
11                  - - -

12  For the Plaintiff:   Benjamin C. Glassman, Esq.
                         United States Attorney
13                       221 East Fourth Street, Suite 400
                         Cincinnati, Ohio  45202
14

15  For the Defendant:   Karen Savir, Esq.
                         Assistant Federal Public Defender
16                       250 East Fifth Street, Suite 350
                         Cincinnati, Ohio  45202
17

18

19  Courtroom Deputy:    William Miller

20  Court Reporter:      Julie A. Wolfer, RDR, CRR
                         100 East Fifth Street
21                       Cincinnati, Ohio  45202

22                  - - -

23

24

25

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

<u>PROCEEDINGS</u>

1

2          (In open court at 11:10 a.m.)

3              COURTROOM DEPUTY:  <u>United States of America versus</u>

4     <u>Michael Bartlett</u>, Case Number 1:13-CR-53.

5              THE COURT:  Good morning to everyone.

6              Let me ask counsel to please enter their appearances

7     for the record.

8              MR. GLASSMAN:  May it please the Court, Ben Glassman

9     on behalf of the United States.

10             MS. SAVIR:  Good morning, Your Honor.  Karen Savir on

11    behalf of Michael Bartlett.

12             THE COURT:  And are you Michael Bartlett?

13             THE DEFENDANT:  Yes, I am, Your Honor.

14             THE COURT:  And are you represented in this proceeding

15    by Karen Savir, an attorney who's present here in court with

16    you today?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  We're here today on a supervised release

19    violation.  A report has been prepared by the Probation

20    Department, by Ms. Mutter from the Probation Department, and it

21    was -- let's see, the date of the second amended report is

22    October 25th, 2017.

23             Let me ask counsel, have you received a copy of the

24    report, Mr. Glassman?

25             MR. GLASSMAN:  Yes, Your Honor.

1          THE COURT:  And, Ms. Savir, have you received a copy

2     of the report?

3          MS. SAVIR:  Yes, Your Honor.

4          THE COURT:  And, Mr. Bartlett, have you received a

5     copy of the report?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  And have you had an opportunity to discuss

8     it with your attorney, Ms. Savir?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  Mr. Glassman, what are the charges in this

11    proceeding?

12         MR. GLASSMAN:  Well, Your Honor, the petition for --

13    the underlying charges was filing a false document with respect

14    to taxes, 18 U.S. Code Section 287.  With respect to the

15    petition for the supervised release revocation, that was for

16    a -- the petition was for a new law violation.  That would be a

17    violation of 18 U.S. Code Section 1028 with respect to the

18    fabrication of a State of Ohio driver's license.

19         THE COURT:  Okay.  But I understand -- you're only

20    proceeding, as I understood it, on a supervised release

21    violation?

22         MR. GLASSMAN:  With respect to the supervised release

23    violation, I have spoken with Ms. Savir and we have discussed

24    the matter, and it is agreeable to the government to proceed as

25    a Grade C violation of supervised release inasmuch as

1    Mr. Bartlett provided false information to a potential

2    employer.

3            THE COURT:  Okay.  All right.  And how does your

4    client plead to the charge, Ms. Savir?

5            MS. SAVIR:  Your Honor, he pleads guilty to providing

6    untruthful information to a potential employer.

7            THE COURT:  All right.  Then I'll hear from you in

8    mitigation.

9            MS. SAVIR:  Yes, Your Honor.

10           Your Honor, as you know from reading the underlying

11   PSI and the violation report and Dr. Heintzelman's letter to

12   the Court, Mr. Bartlett has had to contend with significant

13   mental illness since he was a teenager.  When untreated,

14   Mr. Bartlett's symptoms include command auditory

15   hallucinations, dangerous highs and lows, and difficulty

16   understanding that he is suffering from mental illness at all.

17   That's what happens when he's unmedicated.

18           But even when Mr. Bartlett is off his medication, he

19   has never been physically violent or aggressive.  As indicated

20   in the letter from Dr. Heintzelman, Mr. Bartlett is a quiet

21   individual.  He is kind.  He is highly intelligent.  And he is

22   a loving father and a devoted husband.

23           Your Honor, he's been out of prison for approximately

24   two-and-a-half years.  This is his first revocation proceeding.

25   His supervised release was otherwise set to expire in June,

1    approximately six months from now.

2         Mr. Bartlett is very sorry to be standing before you

3    today.  He very much wants to be a productive, law-abiding

4    individual, and he wants to successfully complete his term of

5    supervision.  Your Honor, no one is perfect.  Even people who

6    don't have to address and overcome significant mental illness

7    make mistakes.  Mr. Bartlett's mistake was being untruthful to

8    a potential employer in order to pass a background check.  He

9    allowed his desperation to get hired and his experience of

10   being denied employment because of his criminal background to

11   subsume his better judgment.

12        As you know from reading the letter from

13   Dr. Heintzelman, he has submitted over 1,200 applications since

14   he's been out of prison.  He has had over 200 interviews with

15   potential employers and has had 12 contingent job offers, and

16   in each of these instances, Mr. Bartlett fully disclosed his

17   criminal background and was denied employment because of it.

18   So that's the context here surrounding this violation conduct.

19        His poor decision to lie during the application

20   process, to pass the word, was clearly misguided.  And this

21   doesn't excuse his behavior, but it was a result of

22   desperation.  At the time he thought if I could just get in the

23   door, I'll do good work, and I'll be able to support my family.

24   He had no nefarious motives.  The government has not pointed to

25   or the Probation has not pointed to any evidence that he was

1    trying to secure this job in order to steal from them.  He just

2    wanted to get in the door and do good work.

3         He has specialized skills and he has the intelligence

4    to get a good job, and it's very tragic and unfortunate that

5    his record is preventing him to do so.  He understands that he

6    went about getting hired in the wrong way, and you will hear

7    that from him directly today.  He knows that what he did

8    constitutes a violation of supervised release and that the

9    Court is likely to revoke him today and will then decide what

10   an appropriate disposition is based on the nature of the

11   violation.

12        So he stands before you today accepting full

13   responsibility for his actions, and he is prepared to hear and

14   do whatever you think is appropriate moving forward.

15        In deciding what an appropriate sentence is for

16   Mr. Bartlett, I would ask that you take Dr. Heintzelman and

17   Dr. Small's input into consideration.  The guideline range for

18   a Grade C violation is 6 to 12 months based on a criminal

19   history category IV.  But Your Honor knows that the guidelines

20   are advisory and the Court can craft any kind of sentence that

21   Your Honor finds reasonable and appropriate given the

22   circumstances.  Mr. Bartlett has been a patient of

23   Dr. Heintzelman and Dr. Small since he was 16 years old.  His

24   mental illness goes way back.  As you know from reading their

25   letter of support, Dr. Heintzelman and Dr. Small are requesting

1    that you consider an alternative to imprisonment today based on

2    a number of mitigating circumstances and the belief that

3    imprisonment is not only unnecessary but that sending

4    Mr. Bartlett to prison would be counterproductive to the

5    overall goals of sentencing which include effectuating

6    necessary medical or psychiatric treatment in the most

7    effective manner under 3553(a).

8           Your Honor, by way of background and in order to

9    understand why continuing Mr. Bartlett on supervision is

10   important from our perspective, I want to talk about

11   Mr. Bartlett's criminal record.  Mr. Bartlett's criminal record

12   is a category -- he falls into a category IV, and I want to

13   note that his prior convictions are theft-related offenses

14   which occurred when Mr. Bartlett was off his medication and not

15   in consistent therapy.

16          His underlying federal offense is tax fraud.

17   Mr. Bartlett committed that offense when he was psychiatrically

18   unstable as well.  Mr. Bartlett was, from my perspective, very

19   lucky to have a prosecutor who looked into his history of

20   mental illness.  Mr. Glassman was not only willing to look into

21   it, but I know that he traveled to Dr. Heintzelman's office and

22   met with him for an over -- for over an hour.  That was

23   reported to me by Dr. Heintzelman.  And the government, after

24   meeting with Dr. Heintzelman back then, was agreeable to a

25   downward variance based on his significant mental impairment

1    based on the mental illness.  And the parties at that time were

2    able to agree to a sentence of 12 months and a day.

3            And that agreement was contingent on a condition of

4    supervised release which was Court-ordered participation in

5    mental health counseling and an order to comply with prescribed

6    antipsychotic medication.  And the importance of this condition

7    of supervised release obviously cannot be overstated.  The

8    mandatory condition has worked to keep Mr. Bartlett on his

9    medication and in continuous treatment with Dr. Small and

10   Dr. Heintzelman who had treated him before since the age of 16

11   but on a voluntary basis so they had no power to force him to

12   come when he needed to come and to stay on medication as he

13   needed to stay on it.  But this condition of supervised release

14   empowered them to make sure that he was doing what he needed to

15   do and that they would be able to monitor him on a very

16   structured, consistent basis.  And they have reported to me and

17   they will report to Your Honor that the Court's involvement in

18   managing his mental illness has been incredibly helpful to them

19   in treating him.

20           His three-year term of supervised release started back

21   on June 5th in 2015 since he has been participating in

22   Court-ordered treatment with Dr. Heintzelman for about

23   two-and-a-half years.  And Dr. Heintzelman reports that

24   Mr. Bartlett is consistent and compliant with his medication

25   regimen and is functioning well, and they consider him to be in

1    a state of remission because of his compliance and because of

2    the Court's decision to intervene with respect to his mental

3    health treatment.

4         Dr. Heintzelman also believes that the best way to

5    handle this violation is through psychotherapy.  He and

6    Mr. Bartlett have already engaged in a good deal of therapy

7    related to the violation.  And it is his position, and you'll

8    hear this from him today, that he believes that no good can

9    come of interrupting his therapy and his medication monitoring

10   by sending him to prison at this stage.

11        Your Honor, Dr. Heintzelman is in the best position to

12   advance this argument, so I will ask that you hear from him

13   shortly.  Our request, though, at base, is that you consider an

14   alternative to incarceration -- the guidelines are advisory,

15   they are not binding on this Court -- and that you instead

16   consider extending his term of supervision.  Don't send him to

17   prison but extend -- revoke him, extend the term of supervision

18   so that he can continue being under Court-ordered treatment,

19   Court-ordered medication, and allow them to address this

20   violation through therapeutic means.

21        If this were a situation where there was any evidence

22   of a nefarious motive behind his desire to get employment

23   through untruthful means, I believe that we would not be

24   standing here today making this argument, but that is not the

25   case.  This is an individual who has spent his entire term of

1   supervision trying to utilize his very specialized skills.

2   He's a highly intelligent individual capable of doing

3   specialized work that could -- that could financially support

4   his family.  But he has bumped up against the reality of an

5   extensive criminal background, and that is something that he

6   needs to figure out and deal with through therapy, and he is

7   doing so.  They are discussing a game plan on how to move

8   forward and how to make sure that he is employable.

9           And, again, this is also not a situation where he had

10  been doing this multiple times.  This is there is a history of

11  applying for jobs in a very, very truthful manner, in fact,

12  laying out his criminal convictions up front before even

13  engaging in interviews to ensure that his criminal background

14  wouldn't prevent him from ultimately getting hired; and each

15  time he was told that they would absolutely consider him, there

16  were no guarantees, but he could potentially secure employment

17  with whatever company he was applying for but they first needed

18  to go through their process.  And so each time he was truthful,

19  and each time he was crushed by the outcome.  And this decision

20  was a bad one.  He should not have done it.  He's very sorry

21  that he decided on this one occasion to apply for a job in an

22  untruthful way.  Fortunately, it was caught immediately, and he

23  has been dealing with it in therapy ever since.

24          So I would ask that you hear from Dr. Heintzelman

25  today and from Mr. Bartlett himself before determining what's

1    appropriate moving forward.

2              THE COURT:  All right.  Thank you.

3              MS. SAVIR:  Thank you.

4              THE COURT:  You may present the evidence any way you

5    want.

6              MS. SAVIR:  Dr. Heintzelman, will you come to the

7    podium?

8              THE COURT:  Dr. Heintzelman, would you be more

9    comfortable just sitting at counsel table?  You can just pull

10   the microphone over to you and testify from there.

11             DR. HEINTZELMAN:  I think it would be fine if I just

12   keep my right hand on this.

13             THE COURT:  Are you sure?  Because --

14             DR. HEINTZELMAN:  Just one.

15             THE COURT:  Okay.  Or you can sit in the witness

16   stand.  Whatever would be more comfortable for you.

17             DR. HEINTZELMAN:  Well, actually it might be a little

18   bit more comfortable.

19             THE COURT:  Yes, that's fine.

20             DR. HEINTZELMAN:  Sure thing.

21             THE COURT:  Good morning.

22             DR. HEINTZELMAN:  Good morning.

23             THE COURT:  I told Ms. Savir I recall you testifying

24   in front of me once before.

25             DR. HEINTZELMAN:  Yes.  Yes.

```
 1              Do you want me to proceed or --

 2         THE COURT:  I think, Ms. Savir --

 3         MS. SAVIR:  Sure.

 4         THE COURT:  -- are you going to ask him questions?

 5         MS. SAVIR:  I can surely proceed in that manner, if

 6    you're comfortable with that.

 7         DR. HEINTZELMAN:  Sure, that would be fine.

 8                         EXAMINATION

 9    BY MS. SAVIR:

10    Q.  Dr. Heintzelman, would you state your name and occupation

11    for the record?

12    A.  Yes.  Mark Heintzelman.  I'm a clinical psychologist, PhD.

13    Q.  And what is your relationship --

14         MS. SAVIR:  Would you like him sworn in?

15         MR. GLASSMAN:  I don't -- it's -- I defer entirely to

16    the Court.  I was wondering whether he needs to have an oath or

17    not.

18         THE COURT:  As to --

19         MR. GLASSMAN:  Whether the doctor should take the oath

20    or not.

21         THE COURT:  Oh.  It doesn't make any difference to me.

22         MR. GLASSMAN:  That's fine.

23         MS. SAVIR:  Okay.  Thanks, Bill.

24         THE COURT:  Do you want to sit down, Mr. Glassman and

25    Mr. Bartlett?  Would you like to sit down while Dr. Heintzelman
```

13

1    testifies?

2            THE DEFENDANT:  No, thank you, Your Honor.  I prefer

3    to stand.

4            THE COURT:  Okay.

5            MR. GLASSMAN:  Thank you, Your Honor.  The same.

6    BY MS. SAVIR:

7    Q.  Dr. Heintzelman, would you explain to the Court what your

8    relationship is with Mr. Bartlett?

9    A.  As you indicated, Mr. Bartlett first became a patient of

10   myself and my partner, Dr. Small, when he was 16 years old.

11   And at that time, he was presenting with significant psychotic

12   decompensation, was diagnosed as bipolar disorder with

13   psychosis.  And, you know, at the age of 16, he was very much

14   out of control.  That was -- the onset of his illness probably

15   precedes that by about six months, and he was seen by another

16   psychiatrist prior to our establishing a relationship with him

17   and -- and the family was not happy with the treatment.  He was

18   misdiagnosed and was not medicated properly or diagnosed

19   properly.  So -- and he's been a patient of ours I would say

20   off and on for over 24 years.  I say "off and on" because it's,

21   as is the case for most individuals diagnosed, my experience

22   with bipolar disorder, especially at the level of severity of

23   Mr. Bartlett's, that compliance with medication is very, very

24   challenging and are going off and on their medication.  And

25   that's one of the tragedies of this illness that -- that so

1    many of those people that are diagnosed with bipolar illness

2    are unusually gifted and talented and yet find the stigma of

3    being on medication to be almost intolerable as well as the

4    changes in subjective sense of self.

5        When you think about bipolar illnesses, including mania

6    which is very euphoric experience associated with feelings of

7    grandiosity, feelings of omnipotence, it's really hard to

8    imagine losing the euphorigenic qualities of that experience;

9    and that, among other reasons, makes it very difficult for many

10   people, even the leading, most well-known researcher in the

11   area of bipolar illness herself was not willing to take

12   medication till she was right around Mr. Bartlett's age despite

13   being diagnosed at 17 and was able amazingly, despite having a

14   incredibly chaotic life experience, was one of the most

15   prolific and productive researchers in the field of bipolar

16   illness.

17       And so I kind of want to make it clear to the Court the

18   severity of Mr. Bartlett's illness.  When Dr. Small and I first

19   took Mr. Bartlett on as a patient at age 16, I honestly didn't

20   expect him to be alive at this point in time.  It is one of the

21   most fatal diagnoses, it is the most fatal diagnosis in

22   psychiatry, highest suicide rates, and Mr. Bartlett's situation

23   was particularly malignant, shall we say, given the added

24   aspect of having auditory hallucinations, being very

25   delusional, and seemed to be very what I would call a brittle

1    bipolar case, meaning that off medications, could decompensate

2    pretty quickly, and yet was, despite that, was very resistant

3    to taking medications because of delusions of grandeur,

4    delusions of omnipotence which as I indicated earlier, often

5    accompany this illness.  And it's very much a disorder, a

6    biologically based disorder of the brain that affects mood

7    regulation and ultimately judgment.  And --

8    Q.  And what is your role with respect to his treatment in

9    comparison to Dr. Small's role?

10   A.  I see him more on a psychotherapeutic basis trying to --

11   we've worked a lot earlier on with learning self-hypnotic

12   skills because Mr. Bartlett is also very, despite some of his

13   what you would think as the grandiosity, is a socially anxious

14   person, and I think that comes a lot from being having -- being

15   significantly bullied throughout his middle school years and

16   his high school experience because of his being a socially -- I

17   guess viewed as being socially inept, very intelligent; so a

18   lot of it was having to have him work with issues around

19   confidence and issues about compliance and the importance of

20   the psychoeducational element to it which is reinforcing the

21   importance of staying with medication and the risk of going on

22   or off medication.  It makes a person more brittle, so to

23   speak, in terms of making any subsequent periods of going off

24   medication that much more severe, and that seems to be borne

25   out in research that the more often that you go off the

16

1    medication and go back on it, the more severe the mood

2    disregulation and the judgment appears to be.

3        So Dr. Small knows Mr. Bartlett very well and would have

4    personally been here if he hadn't suffered a heart attack three

5    weeks ago and is in recovery.  But he's always monitored the

6    medication, oversaw medication, but has also had a therapeutic

7    relationship secondarily to mine with Mr. Bartlett.

8    Q.  And has -- are you aware whether Dr. Small has had to

9    modify the medications being prescribed throughout the years?

10   A.  There has been some modification to a point where I think

11   we finally achieved a polypharmacy mix, if you will, that works

12   very well for Mr. Bartlett.  And for most cases with bipolar

13   illness in this day and age, that it's unipharmacy or having

14   one medication that addresses all the features associated with

15   bipolarity, it's very unusual, especially in Mr. Bartlett's

16   case where you have -- when he decompensates or when he is no

17   longer on medication, becomes quickly pre-psychotic and prone

18   to auditory hallucinations and command hallucinations as you

19   referenced earlier.

20       I think it's important for the Court to understand just

21   how -- it's hard to, seeing Mr. Bartlett as he presents now,

22   it's hard to realize just how severe his situation has been.

23   I've seen him and known him since he was 16 when he was totally

24   out of control and totally -- again, I'm surprised he's alive

25   given the, you know, suicidal attempts, given hospitalizations,

1   given the impulsive reckless behaviors associated with the

2   onset of bipolar illness, particularly during the most

3   vulnerable times in our life which is adolescence when you're

4   already going through all kinds of hormonal changes, you know,

5   add bipolarity to that and you've got a very dangerous, for the

6   sufferer, a very dangerous situation.

7   Q.   Now, you treated Mr. Bartlett prior to his term of

8   incarceration, obviously, since the age of 16.

9   A.   That's correct.

10   Q.   What changes have you noticed since his release from prison

11   and what has your experience with him been since then?

12   A.   Well, it's been pretty dramatic in that for the first time,

13   this is probably about two years ago, year-and-a-half ago, I

14   think Mr. Bartlett showed a sign of fully recognizing just the

15   benefits of being on medication because he was on it long

16   enough to really experience the benefits of it and that how

17   quiet his mind could become on medication. And despite our

18   efforts repeatedly, our efforts, myself and Dr. Small, to have

19   Mr. Bartlett treated when he was incarcerated, there's never

20   been any success in getting the mental health personnel to

21   follow through with that treatment. So he's been unmedicated

22   in every situation in which he's been incarcerated, despite our

23   assurances that he would be treated. And so it's only been I

24   would say the most stable period of his life has been the last

25   two, two-and-a-half years where it's been a dramatic change in

1  terms of his acceptance of it.  I think being a husband and

2  being a father of two young sons that he adores and is very

3  committed to making their life one of quality, and I think

4  that's really made a shift in his consciousness and --

5  Q.  Now, are you aware of the nature of the violation --

6  A.  Yes, I am.

7  Q.  -- that has brought Mr. Bartlett to court today?

8  A.  Right.

9  Q.  And can you shed any light as to perhaps what motivated the

10 poor decision making and what your view of the violation is?

11 A.  Yes, I -- what I've been witness to, and I think I've

12 indicated this in the letter I wrote, that is seeing

13 Mr. Bartlett being very enthusiastic and hopeful about being

14 employed by the companies that were very impressed with his

15 skill set, and I think for the departments they interviewed

16 with, they were hopeful that human resources would overlook

17 his -- his criminal record knowing his mental illness, and he

18 was open about that and honest about that.  And to then be told

19 sometimes as long as two months after the process of pre --

20 pre-employment that his human resources had declined his

21 employment opportunities, it was very crushing, as you said, to

22 him.

23      And I see that probably the biggest precipitant to his

24 being untruthful in his job application, the most recent one,

25 was the notification on the part of his mother that his father

19

1   is retiring and probably retiring within a week or so and that

2   they wouldn't be able to sustain the kind of support they've

3   been able to provide him, and I saw certain desperation with

4   Mr. Bartlett as to how he was going to provide for his family.

5   I know his -- I've talked to his mother. I know she's

6   feeling -- was feeling extremely guilty and worried that

7   letting him know about their financial status would put

8   enormous pressure on him but that it was necessary to do so,

9   and it was going to be inevitable that he was going to find out

10   that they couldn't support him at the same level of -- that

11   they had been assisting him in his support. Keeping in mind

12   that Mr. Bartlett had -- has had periodic short-term jobs that

13   have been more -- I guess they've been more by design, you

14   know, four to six months in length. They've been -- and

15   they've been not through being hired by the company but I

16   believe from, if I'm not mistaken, that it's been through

17   headhunters or a temp agency that will hire somebody for a

18   brief period of time for a specific -- a specific job or a

19   specific role but not being hired on as a employee of that

20   particular company. So the liability factor is not there in

21   the same way it would be presumably if hired by GE or P&G.

22   Q. Now, are you aware that the government is seeking a prison

23   sentence in this matter based on the violation?

24   A. Yes, I am.

25   Q. And why did you feel that it was important for you to come

1  to court today?

2  A.  Well, I think that there would be tragic for a number of

3  reasons.  One, he's not going to be treated psychiatrically in

4  any meaningful way, at least if history repeats itself, and

5  it's been at least four, minimum three or four times that we've

6  tried to impress upon the prison officials of the importance of

7  him being on medication and that he suffers from a severe

8  biological disorder.

9      It would be, I think, devastating to his family.  I know it

10  would be in terms of the financial impact.

11      I also think that it would be tragic in that he's made such

12  remarkable progress given -- given the severity of the illness

13  that he inherited and that he's come so far, and to see it end

14  up in a -- in prison would be tragic for not only him

15  personally but I think for society in a sense.  You know, I

16  think he can be, given the right opportunity, a very --

17  contribute significantly to -- to society in terms of being a

18  good citizen, being a hard worker, being a tax-paying

19  individual, and just personally be a huge loss for myself and

20  Dr. Small to see someone that has come so far from being so

21  severely afflicted with mental illness to only be incarcerated

22  and I think would make his illness worse.  I know it would

23  compromise his health.  And I would see -- personally, I don't

24  know how there would be any benefit to society whatsoever for

25  him being incarcerated.  And --

21

1  Q.   What would you propose the Court do in this situation?

2  A.   I think as I probably indicated in my letter, that extended

3  probation, mandatory therapy.  I don't -- and the kind of

4  oversight that's been provided has been -- by myself and

5  Dr. Small I think has been very effective.

6        I've been impressed with Mr. Bartlett's, in spite of so

7  many discouraging experiences, has pursued relentlessly

8  employment.  And, you know, I think that, you know, we were in

9  the process of talking about alternatives, myself, Dr. Small

10 and Mr. Bartlett, about self-employment and trying to get him

11 to feel confident enough that he can do that.  I think he could

12 be very successful.  I think he -- part of the difficulty has

13 been overcoming some of his inherent shyness.  He's not the

14 most -- he's not the best at self-promotion, and so we're

15 talking about ways in which that can be dealt with and because

16 I do think that, you know, I've -- I mean, I've seen what he's

17 accomplished.  I mean, he didn't graduate from high school and

18 he got his GED, and then he went through the kind of training

19 that he's received has been remarkable at a young age and all

20 the Metasoft, you know, every certification you can get.  And

21 so I think his work history when he's been stable enough to be

22 able to be focused has been -- speaks for itself.  I think he

23 can be very successful, even more successful than he's ever

24 imagined given that he's stable and he's in remission.  It's

25 the longest he's been in remission in my knowing Mr. Bartlett.

22

1    Q.   Thank you.

2         Is there anything else you want to tell the Court?

3    A.   I don't think I can add any more, impress upon the Court

4    any more my -- my hopes that the Court will show some leniency

5    in this circumstance and to recognize that -- that when you see

6    someone, anyone who's had that severity of mental illness and

7    still does make the kind of efforts he has to be a responsible

8    father and a parent and a responsible member of society,

9    it's -- I just hope the Court will consider that in their

10   decision as to his disposition.   That's all.

11   Q.   Thank you.

12        MS. SAVIR:   Nothing further, Your Honor.

13        THE COURT:   All right.   Mr. Glassman, do you wish to

14   ask Dr. Heintzelman any questions?

15        MR. GLASSMAN:   I just did have maybe one question for

16   Dr. Heintzelman.

17                       EXAMINATION

18   BY MR. GLASSMAN:

19   Q.   In the second paragraph of the letter, and you spoke about

20   it today, you talked about a lot of different job leads,

21   applications that were -- didn't pan out.   Did that

22   information, does that come from Mr. Bartlett?

23   A.   That's correct.

24   Q.   Okay.

25        THE COURT:   Thank you.   Anything else, Mr. Glassman?

23

```
 1              MR. GLASSMAN:  No, Your Honor.  Thank you.

 2              THE COURT:  Anything else from Dr. Heintzelman?

 3              MS. SAVIR:  No, Your Honor.

 4              THE COURT:  Dr. Heintzelman, the Court appreciates you

 5    coming here today.

 6              DR. HEINTZELMAN:  Thank you.

 7              Excuse me, Judge, am I free to leave or should I --

 8              THE COURT:  Sure.  Of course.

 9              DR. HEINTZELMAN:  Is that --

10              MS. SAVIR:  Sure.  Thank you.

11              THE COURT:  Anything else, Ms. Savir?

12              MS. SAVIR:  Yes, Your Honor.  Mr. Bartlett would like

13    to say a few words.

14              THE COURT:  All right.

15              THE DEFENDANT:  Your Honor, I am deeply sorry and

16    remorseful for what I've done.  I know there's no excuse for my

17    behavior.  I was under a tremendous amount of stress, and I

18    wasn't prepared for the ramification of my actions.  At the

19    time, I was facing the possibility of losing the job that I

20    had, which I ultimately did.  And my parents who provided for

21    my family with -- my family and I with financial support, I

22    found out they wouldn't be able to do so after the end of the

23    year.  I've applied for hundreds of jobs in the past year and

24    I've received several offers, but each time the job offer is

25    revoked because of background check, even though I disclose and
```

1    explain my background to the employers.

2              I ask that you please not send me to prison.  I've

3    learned my lesson.  I have -- this ordeal has put a great

4    strain on myself and my family, including my wife and two young

5    children who rely on me for financial support.  I've since

6    started my own business, and I've just secured my first

7    project.

8              I just want to be a productive member of society, a

9    law-abiding member, and just can say with confidence that this

10   will not happen again.

11             THE COURT:  What kind of business have you started?

12             THE DEFENDANT:  Computer consulting.

13             THE COURT:  Okay.

14             All right.  Anything else --

15             MS. SAVIR:  No, Your Honor.

16             THE COURT:  -- Ms. Savir?

17             Mr. Glassman?

18             MR. GLASSMAN:  Yes, Your Honor.  I'd like to make a

19   couple of points and a recommendation to the Court.

20             To skip to the recommendation first, I agree with

21   Ms. Savir that the guideline range for this Grade C violation

22   is 6 to 12 months in prison.  The United States would recommend

23   a term of imprisonment of 18 months followed by 18 months of

24   supervised release, and this is -- these are the reasons why.

25             First, if you look at Mr. Bartlett's criminal history,

1   he does have a history, a consistent history of fraudulent

2   conduct, and that is consistent with the underlying offense of

3   criminal conviction and it is consistent with the violation of

4   supervised release that brings us into court today.

5           I would say, I want to say this with the utmost

6   respect, that I -- I am sure that there has been a great deal

7   of benefit to Mr. Bartlett from the mental health treatment

8   from Mr. -- Dr. Heintzelman and Dr. Small.  Whatever other

9   benefit it's doing, though, it has not stopped his fraudulent

10  conduct.  He's been under their care since he was 16.  He's

11  committed all of these offenses while under their care,

12  including currently when the Dr. Heintzelman said that he had

13  been in remission from his symptoms and yet fabricated the

14  fraudulent driver's license and birth certificate.

15          With respect to the point that was made by

16  Dr. Heintzelman about Mr. Bartlett's treatment while he was in

17  prison, I would simply note that Mr. Bartlett was released from

18  prison in June of 2015, and there is no indication that he was

19  unstable in any way in the supervised release report or

20  otherwise; and I'm sure that the probation officer could verify

21  that if the Court has any questions.

22          With respect to his employment efforts, in fact

23  Mr. Bartlett was employed, as he just said.  He had a job and

24  has not, although everyone who comes out of prison does have

25  problems, of course, finding employment, Mr. Bartlett had

1  succeeded in finding a series of jobs. And so his violation of

2  supervised release here was actually in an effort to get a

3  better or higher-paying job, which isn't necessarily a bad

4  thing, but it is not the situation that Mr. Bartlett could not

5  find employment. He was in fact employed.

6          Now, given -- oh, I'm sorry, the -- I agree with

7  Ms. Savir's point that we wouldn't be here today if this was a

8  Grade B versus a Grade C violation. If Mr. Bartlett, for

9  example, had stolen someone else's identity or had stolen

10  money, I completely agree with that. But that is one of the

11  reasons why the government was agreeable to proceeding via the

12  Grade C violation as opposed to the Grade B.

13          Similarly, his mental health background, I agree with

14  Ms. Savir, was one of the reasons that the government was

15  agreeable in the underlying criminal case to a (c)(1)(C) plea

16  agreement for 12 months and a day of imprisonment because the

17  guidelines called for 37 to 46 months of imprisonment.

18          So taking all of that into consideration, the reasons

19  for our recommendation of 18 months in prison followed by 18

20  months of supervised release, there are two Application Notes

21  that are relevant. One is -- these are for 7B1.4. One is in

22  the case of a Grade C violation that is associated with a high

23  risk of new felonious conduct, an upward departure may be

24  warranted. The government thinks that applies.

25          And, second, where the original sentence was the

1    result of a downward departure or a charge reduction that

2    resulted in a sentence below the guideline range applicable to

3    the defendant's underlying conduct, an upward departure may be

4    warranted.

5           Both of those circumstances would seem to the

6    government to be the case here.

7           THE COURT:  What was the first one again,

8    Mr. Glassman?

9           MR. GLASSMAN:  The first one was in the case of a

10   Grade C violation that is associated with a high risk of new

11   felonious conduct.

12          THE COURT:  Okay.  Thank you.

13          MR. GLASSMAN:  And so given that the original term of

14   imprisonment was 12 months and a day, the United States thinks

15   that some term of imprisonment higher than that original term

16   would be appropriate to bring home the point that fabricating

17   fraudulent documents simply can't be tolerated and the

18   fraudulent conduct must stop.

19          And then the United States does think, and I recognize

20   that Probation does not necessarily agree with the government's

21   recommendation, that there should be some additional term of

22   supervision following that term of imprisonment for all of the

23   reasons that Ms. Savir said, to ensure that in fact whatever

24   term of imprisonment, if any, the Court imposes today does

25   bring home the message that the fraudulent conduct needs to

28

1    stop.

2            Thank you, Your Honor.

3            THE COURT:  Thank you.

4            Ms. Savir, anything else?

5            MS. SAVIR:  Your Honor, I would just urge you to take

6    a look at the bigger picture.  I know this Court always does.

7    That message has been driven home for Mr. Bartlett.  I mean, if

8    you spend any time with him at all, you will see how remorseful

9    and -- he is for what he's done and how terrified he is by the

10   possibility of prison today.

11           You know, he has been out for two-and-a-half years.

12   He has come to terms with his significant mental illness.  That

13   has -- that is a huge transformation for someone like

14   Mr. Bartlett.  He is now consistently taking his medication.

15   He is engaged in productive and meaningful psychotherapy with

16   Dr. Heintzelman.  Yes, there have been problems along the way,

17   and those are to be expected given the nature of his illness.

18   But I cannot wrap my mind around this idea of sending

19   Mr. Bartlett to prison for 18 months based on the nature of

20   this violation, what motivated it, what you've heard today from

21   the people -- or the person who knows him best.

22           I would ask that you consider the mitigating

23   circumstances here.  There are mitigating circumstances

24   surrounding his very unfortunate choice to be untruthful during

25   this application process.  It came on the heels of a very long

1    and consistent period of time when he was being truthful.  I

2    know that he wishes that he could go back and change that

3    application process, but he can't.  He has to deal with those

4    consequences, but he's dealing with them in a very productive

5    and therapeutic way.  His doctors now know what occurred with

6    that instance, and they're going to work with him moving

7    forward to make sure that that problem doesn't repeat itself.

8            Your Honor, there is no goal under 3553(a) that would

9    be best effectuated through the imposition of a term of

10   incarceration here.  I would ask that you consider an

11   alternative.  He is doing well.  He made a mistake.  He's

12   learning from it.  He's not going to repeat that mistake.  But

13   he is doing -- generally he's doing very well.  He's showing up

14   for psychotherapy.  He's taking his meds.  He's applying for

15   jobs.  He's doing side jobs, consulting jobs in the meantime

16   until he finds something stable and long-term.  He is a good

17   husband, a good father.  He is paying his restitution back a

18   hundred dollars a month consistently.  This is someone who

19   wants to do well, but he suffers from a terrible illness and

20   he's not perfect.  None of us are.  But for him, he faces even

21   more difficult obstacles than the run-of-the-mill defendant who

22   comes before you on a supervised release violation.

23           Given the overwhelming quantity of mitigating

24   circumstances here, I would ask that you consider an

25   alternative this one time for him.  Let him continue with

30

1    therapy under the supervision of Dr. Small and Dr. Heintzelman,

2    extend his supervision for as many years as you think

3    appropriate.  It's clearly doing him well.  He's someone who

4    has not been able to stay on meds until the Court imposed an

5    order that he stay on it, and he's been compliant with that

6    order.  So I would ask that you reimpose that condition, extend

7    the term of supervision for a number of years, and let him

8    continue and learn from this mistake.

9              THE COURT:  Thank you, Ms. Savir.

10             Anything else, Mr. Glassman?

11             MR. GLASSMAN:  Nothing further, Your Honor.

12             THE COURT:  I have a question for you or Ms. Mutter,

13   and that is assuming he's going back to prison, is there any

14   way we can be assured that he can get his medication while he's

15   there?

16             MR. GLASSMAN:  Let me confer with Ms. Mutter before

17   answering the Court.

18             THE COURT:  Okay.

19        (Mr. Glassman conferring with Probation Officer Mutter.)

20             MR. GLASSMAN:  Your Honor, after conferring with

21   Ms. Mutter, we -- it's our understanding that the Bureau of

22   Prisons does treat people with significant mental health

23   disorders.  And part of the -- part of my comments earlier were

24   that when he was released from prison last time, there was --

25   he was not unstable or in any way out of control.  But I would

1  be happy to give this Court my word as an officer of the court

2  that I will follow up with the Bureau of Prisons specifically

3  to ensure that whatever psychiatric medications are prescribed

4  are indeed administered.

5          THE COURT:  All right.  Because that probably concerns

6  me more than anything else.  If the situation is under control

7  and if he weren't going to be -- if at least his psychological

8  state is stable, I don't want to destabilize him by putting him

9  in an environment where he's not going to get the medication he

10 needs because it seems to be successful.  So I'd like some

11 assurance from the Bureau of Prisons that he will get the kind

12 of psychiatric medication that he needs.

13         MR. GLASSMAN:  And, Your Honor, I'd be happy if

14 Ms. Mutter has anything further, I didn't mean to cut her off.

15         PROBATION OFFICER MUTTER:  I don't have anything

16 further, Your Honor.  I know that there are different care

17 levels in prison.  There's care level one, two, and three, and

18 somebody with a significant and chronic mental disease would

19 get treatment in the prison.  They may not get the same exact

20 medicine that they're on depending on, you know, the cost and

21 things like that, but it's my understanding that he was treated

22 in prison previously.

23         MS. SAVIR:  Your Honor, that is incorrect.  And I

24 would like to ask for a continuance if Your Honor is going to

25 base your decision on this situation because my understanding

1   is that the BOP disagreed with Dr. Heintzelman and Dr. Small's

2   diagnosis in the first place and that he was unmedicated during

3   his entire term of imprisonment.  And I believe that we can get

4   a clear answer on this issue if it's --

5           THE COURT:  That's very important to me.  I would like

6   to know that because I think that would make a huge difference

7   because, frankly, my intention would be to send Mr. Bartlett to

8   prison because -- because of his previous conduct; some of the

9   reasons that the government asked for an upward departure, that

10  he did receive a break from the Court earlier; that this

11  violation is the result of new felonious conduct.  That

12  concerns the Court very much that he's got a history of

13  fraudulent conduct and it seems to be continuing regardless of

14  whether he is or isn't medicated, and I think there has to be

15  some penalty for that.  However, if he is going to go to the

16  Bureau of Prisons and be unmedicated, I'm not willing to allow

17  that.

18          So we're going to recess this hearing in progress, and

19  I would like something definitive from the Bureau of Prisons.

20          And I'm sure, Ms. Mutter, do you have enough of his

21  psychiatric records or do you need to get records from

22  Dr. Small and Dr. Heintzelman that the Bureau of Prisons can

23  evaluate?

24          PROBATION OFFICER MUTTER:  Yes, Your Honor, I believe

25  that we would need to procure the most recent records in order

33

1   for that to happen.

2          THE COURT:  Okay.  Ms. Savir, can you provide those to

3   Ms. Mutter?

4          MS. SAVIR:  I sure can, Your Honor.

5          THE COURT:  All right.  And I think, then, we'll just

6   continue this hearing until I can get some definitive answer

7   from the Bureau of Prisons, which I know is not easy to get.

8   But I'd like to know if he's going to be medicated and how he's

9   going to be medicated if he is sent to the Bureau of Prisons.

10         MS. SAVIR:  And, Your Honor, would you like us to

11   confirm whether or not he was given medication during his last

12   term of imprisonment?

13         THE COURT:  Yes.  That would be helpful also.

14         MS. SAVIR:  Thank you.

15         THE COURT:  Thank you.

16         All right.  We'll continue this matter.

17     (Proceedings concluded at 12:05 p.m.)

18                 - - -

19

20               C E R T I F I C A T E

21      I certify that the foregoing is a correct transcript

22   from the record of the proceedings in the above-entitled

23   matter.

                       s/Julie A. Wolfer

24                       Julie A. Wolfer, RDR, CRR
                       Official Reporter

25